**E-FILED**
Friday, 18 October, 2013  12:22:22 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BIRTY ADCOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3316 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Birty Adcox appeals the denial of her application for Supplemental Security Income (Disability Benefits) under Title XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1381a, 1382c, and 1383(c). Adcox has filed a Brief in Support of Motion for Summary Judgment (d/e 12) (Adcox Motion), and Defendant Acting Commissioner of Social Security (Commissioner) has filed a Motion for Summary Affirmance (d/e15).[1]  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to Proceed Before a United States Magistrate and Order of Reference, entered June 21, 2013 (d/e 14).  For

---

[1] Carolyn Colvin is now Acting Commissioner of Social Security.  Motion for Summary Affirmance, at 1 n.1.  Colvin is, therefore, automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Adcox was born on September 16, 1988.  She completed the ninth grade and part of the tenth grade.  Her past employment included working in telephone sales.  Answer to Complaint (d/e 9), attached Certified Copy of Record of Proceedings Before the Social Security Administration (R.), at 52-53.  Adcox gave birth to her daughter on July 5, 2007.  Adcox has lived with and cared for her daughter since birth.  R. 117, 421.  Adcox suffers from bipolar disorder, post-traumatic stress disorder, borderline personality disorder traits, and paranoid personality features.  Adcox also claimed to have pain in her ankle, hip, back, and abdomen.  R. 9.

On April 7, 2008, state agency clinical psychologist Dr. Frank Froman, Ed.D., evaluated Adcox.  Dr. Froman diagnosed Adcox with bipolar II disorder; mixed personality disorder with borderline, passive aggressive, and antisocial traits; and borderline to low normal intellectual functioning.  He gave her a Global Assessment of Functioning (GAF) score of 48.  R. 290.  Adcox reported that she planned to seek counseling.  Dr. Froman opined that Adcox was "able to perform simple one and two step assemblies at a competitive rate," but she had poor ability to relate to

others, and she appeared to be "only marginally able to withstand the stress associated with even mild levels of employment." R. 291. Dr. Froman concluded that at the time of the evaluation Adcox appeared unable to work around people or "stay the course." R. 291. Dr. Froman recommended that Adcox receive another assessment following a course of therapy. R. 291.

On May 15, 2008, psychiatrist Dr. Salvador Sanchez, M.D., conducted a psychiatric evaluation of Adcox. R. 472-75. Dr. Sanchez diagnosed bipolar disorder, borderline personality disorder, and borderline intellectual level of functioning. He assessed a GAF score of 65. R. 474. Dr. Sanchez prescribed Lexapro, counseling, and cognitive behavior therapy. R. 475.

On December 15, 2008, Adcox saw physician's assistant T. Oakley, P.A., at the Quincy Family Practice Center in Quincy, Illinois, complaining of anxiety. R. 445-46, R. 458. She reported that she was taking Lexapro "and it did help with the attacks but she stopped taking it for no particular reason." She reported daily anxiety symptoms that usually were worse at night. She reported difficulty sleeping. Oakley restarted her on Lexapro. R. 458.

On January 2, 2009, Adcox began a six-month plan of counseling services at Transitions of Western Illinois ("Transitions" or "TWI").  The plan called for regular counseling and medication.  R. 490-94.

On January 9, 2009, Adcox went back to the Quincy Family Practice for treatment to quit smoking.  She saw Dr. H. Calipjo, M.D.  She reported that the Lexapro was controlling her symptoms of anxiety and depression.  Dr. Calipjo prescribed Chantix.  R. 457.

On July 27, 2009, Transitions discharged Adcox from all agency services.  Transitions records state the reason for the discharge as, "Lack of Participation:  Consumer declined recommended TWI services by not showing for appointments, not responding to attempts to contact, or by not being accessible to contact."  R. 495.

On October 25, 2009, Adcox's uncle Rod Owlsey prepared a Function Report – Adult Third Party form.  R. 169-76.  Owsley reported that Adcox lived with family.  He reported that Adcox cared for her daughter.  He reported that Adcox had difficulty sleeping.  He reported that she had problems bathing and feeding herself.  He reported that Adcox wrote herself reminders to do things, including taking medication.  He reported that she prepared meals using a microwave oven.  Adcox performed household chores such as vacuuming, dusting, sweeping, mopping, and

laundry, but no yard work.  Adcox left the house two or three times a week.

She left by herself.  She went grocery shopping four to five times a month.

He reported that her condition affected her in the areas of:  completing

tasks; concentration; understanding; following instructions; and getting

along with others.  He reported that she followed written and oral

instructions "pretty good."  R. 173.  He said that she was "very good" at

getting along with authority figures.  He reported that she did not like

changing routines.  R. 169-74.

On October 26, 2009, Adcox completed a Function Report – Adult

Form.  R. 193-200.  Adcox reported that spent her days cooking and

cleaning and taking care of her daughter.  She reported that her uncle

helped her take care of her daughter.  She reported that her illness affected

her memory.  She reported that she had trouble sleeping.  She reported

that she had trouble bathing and feeding herself.  She stated, "Sometimes

don't take showers enough," and "Sometimes eat too little or over eat."

R. 194.  She reported that she needed family members to remind her to do

things, including taking medications.  She reported that she cooked three

meals a day and spent three hours a day doing housework, but no yard

work.  She reported that she went shopping three to four times a month.

She walked and used public transportation.  She reported that her illness

affected her in the areas of: talking; memory; completing tasks; concentration; understanding; following instructions; and getting along with others.  She reported problems remembering and concentrating.  She reported that she followed written and oral instructions "pretty well."  R. 198.  She reported that she got irritated with authority figures.  She reported mood swings, anxiety, and feelings of paranoia.  R. 193-200.

On October 26, 2009, Transitions staff prepared an assessment of Adcox.  R. 673-89.  The assessment noted Adcox's diagnoses of bipolar disorder and personality disorder.  The assessment indicated that she suffered from several problems, including panic attacks.  R. 673.  The assessment also indicated that she had problems with getting out of bed, conflicts with authority figures, problems with physical aggression, and problems with poor judgment in social situations.  R. 674.  The assessment indicated that Adcox was immature for her age; suspicious, evasive, and impulsive; engaged in guarded behavior; had a labile affect; had soft, fast, and over talkative speech with use of baby talk; was distractible; had loose associations in her thought processes; and had poor insight and judgment.  The assessment stated that Adcox was able to participate in treatment, but was impaired by her limited attention/focus.  R. 684.  The Transitions staff gave Adcox a GAF score of 50.  R. 685.

On December 3, 2009, Dr. Froman conducted another psychological evaluation of Adcox.  Dr. Froman stated that Adcox's psychological profile "was un-interpretable" because of her "endorsement of so many" psychological problems.  Dr. Froman continued, "This suggests that she has a tendency of over-presenting psychopathology to a significant degree, and that her subjective assessment of herself is only marginally related to objective circumstance."  R. 519.

Dr. Froman diagnosed bipolar disorder; history of posttraumatic stress disorder (PTSD), secondary to sexual victimization; borderline personality disorder, paranoid personality features; and fatigue.  He rated her psychological problems as moderately severe.  He assessed her with a GAF score of 56.

Dr. Froman concluded:

> If Birty finds an appropriate treatment regimen to settle her, she will likely be able to perform one or two step assemblies at a competitive rate.  Her ability to get along with others, however, is compromised by a sense of wariness, and a chronic level of character disorder that makes relationships problematic.  She is able to understand simple oral and written instructions and appears able to manage cash benefits.  Were she motivated, I believe that she would be able to withstand the stress associated with customary employment.

R. 520.

On December 18, 2009, agency psychologist, Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for Adcox.  R. 497-513.  Dr. Mehr opined that Adcox suffered from bipolar disorder, on medication; PTSD; borderline personality disorder with paranoid traits.  R. 497-506.  Dr. Mehr opined that Adcox had mild restriction on activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation.  R. 507.  Dr. Mehr opined that Adcox was moderately limited in her ability to: understand and remember detailed instructions; carry out detailed instructions; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  R. 512.  Dr. Mehr concluded, in part:

> [Adcox] has lost several jobs because she relates poorly to her supervisors, or walks off.  Now on medication in treatment she may relate more appropriately.   This lady is fully oriented, free of serious memory impairment, and is acceptably independent in activities of daily living.  She retains sufficient cognitive capacity to understand and remember instructions for simple tasks of a routine and repetitive type.  She, in addition, retains sufficient attention and concentration to persist and complete activities for extended periods of time.  She retains adequate pace and endurance to maintain a schedule and punctual attendance, and to complete a normal workday and work week.

She is able to perform at a regular, minimally acceptable rate, requiring only the usual frequency and lengths of rest breaks.

She retains the capacity to accept instructions, to tolerate supervision, and to get along with coworkers or peers. She has limited social tolerance and would do best in a socially undemanding and restricted setting with reduced interpersonal contact, away from the general public.

She retains the capacity to adjust to changes in daily routines, and to be aware of and self-protective of common hazards. This woman also retains the capacity to utilize public transportation to and from a place of work.

R. 513.

On January 22, 2010, Adcox again saw Dr. Sanchez, n/k/a

Dr. Sanchez-Zuniga. She complained of feeling "hopeless, helpless,

worthless, guilt, chronic feelings of emptiness, poor self-image." R. 525.

She reported being forgetful and distracted. She reported problems

sleeping. Adcox reported that in the past she had thoughts of cutting

herself or overdosing, but not recently. She reported no suicidal ideations

recently. R. 525. Dr. Sanchez-Zuniga noted that he previously treated her

at Transitions "with poor compliance." R. 525. Dr. Sanchez-Zuniga

observed Adcox had a dysphoric mood and a constricted affect, but her

memory, attention, registration and concentration appeared to be intact.

R. 526. Dr. Sanchez-Zuniga diagnosed Adcox with bipolar disorder and

borderline personality disorder traits. He assessed Adcox with a GAF

score of 50. R. 526. He changed her medication. R. 527.

On May 11, 2010, Adcox saw Dr. Sanchez-Zuniga. Adcox reported that she was less depressed. She reported to Dr. Sanchez-Zuniga, "'I switched boyfriends.'" R. 577. Dr. Sanchez-Zuniga referred Adcox to Transitions for counseling. R. 577.

On June 16, 2010, Adcox met with Transitions counselor Allison Holbrook. Adcox reported that she was handling her emotions better than in the past. She reported that she was not taking her medications. R. 638. On June 23, 2010, Adcox met again with counselor Holbrook. Adcox reported feeling down. Holbrook gave her suggestions on how to handle her emotions. Adcox reported that she had some troubles because she was not taking her medications. R. 639.

On June 29, 2010, Adcox saw Dr. Sanchez-Zuniga. Dr. Sanchez-Zuniga's note regarding anxious and panicky feelings was, "mostly chronic dysphoria." Dr. Sanchez-Zuniga also noted that Adcox was "very inconsistent and non-compliant" with her medications. Dr. Sanchez-Zuniga noted that Adcox was working with a counselor at Transitions. R. 660.

On June 30, 2010, Adcox saw counselor Holbrook. Adcox reported that she was handling her emotions "okay." She reported that spending time with her daughter helped. Holbrook gave her suggestions on how to handle her emotions. R. 640.

On July 21, 2010, Adcox saw counselor Holbrook.  She reported arguments with her boyfriend were causing increased anxiety.  She was trying to get a place of her own.  R. 642.  On July 28, 2010, Adcox saw Holbrook again.  Adcox reported experiencing anxiety from the stress of caring for her child.  She also reported difficulties being assertive with her boyfriend.  R. 643.

On August 9, 2010, Adcox spoke to Holbrook over the phone.  Adcox reported trying to cope with her symptoms.  She reported stress associated with her living situation.  R. 645.  On August 12, 2010, Adcox met with Holbrook.  Adcox reported that she was planning to begin GED classes the next week.  She was very excited about starting school and doing something for herself.  Adcox and Holbrook also discussed Adcox's current level of anxiety, her experiences with panic attacks, and how to recognize the precursors of an attack.  R. 646.  On August 18, 2010, Adcox met with Holbrook again.  Adcox reported that she was trying to think positively and using relaxation techniques when she felt anxious.  She reported problems with her boyfriend.  R. 647.

In August 2010, Adcox saw Dr. Sanchez-Zuniga again.  Adcox reported that she quit her medications because they were making her sick.  On the question of anxiety and panic, Dr. Sanchez-Zuniga noted a quote

from Adcox, "'I'm more positive.'"  R. 659.  Dr. Sanchez-Zuniga

discontinued Adcox's medications. R. 659.

On September 1, 2010, Adcox met with counselor Holbrook.  Adcox

reported that she was enjoying her GED classes.  She was also looking to

move out on her own if she secured Social Security Disability Benefits.

R. 648.  On September 8, 2010, Adcox met with Holbrook.  Adcox reported

stress with her boyfriend.  She was planning to move soon.  Adcox also

reported that she was able to recognize her symptoms more easily.

R. 649.  On September 22, 2010, Adcox again met with Holbrook.  Adcox

reported that she was doing better at recognizing her changes in mood.

Adcox reported that she wanted to continue working on emotion regulation

and dialectical behavior therapy.  R. 707.

On October 19, 2010, Adcox saw Dr. Sanchez-Zuniga again for a

follow-up.  Adcox reported being "very happy."  She was attending school

and working with a counselor for therapy.  On the question of anxiety and

panic, Dr. Sanchez-Zuniga reported, "Decreased –panic attacks improved."

R. 658.  Dr. Sanchez-Zuniga indicated that Adcox continued therapy at

Transitions.  R. 658.

On December 14, 2010, Adcox saw Dr. Sanchez-Zuniga. Dr. Sanchez-Zuniga reported that Adcox was taking Lexapro daily. Adcox reported that she was excited about Christmas. Her daughter was three years old at this time. She reported that she had a good relationship with her two boyfriends. She denied feelings of anxiety or panic. She reported good sleep and good appetite. R. 657.

On March 11, 2010, Adcox completed another Function Report – Adult Form. R. 216-23. Her answers were similar to her answers to the October 26, 2009, form. She spent most of her time taking care of her daughter and cleaning. In addition, she reported that she occasionally wet herself. She answered the question about whether she could follow instructions, "Not well, sometimes I can." R. 221. She reported that she avoided authority figures such as teachers and bosses. She reported that she was paranoid and scared to go out. R. 216-23.

On June 6, 2011, an Administrative Law Judge (ALJ) held a hearing on Adcox's application for Disability Benefits. R. 30-64. The ALJ conducted the hearing from Chicago. Adcox and her attorney appeared by video conference from Hannibal, Missouri. R. 10. A vocational expert Amy Kutschbach, appeared by telephone. R. 32.

Adcox testified first at the hearing.  Adcox testified that she lived with her daughter and a roommate.  She testified that she did not pay rent at this time.  R. 33-34.  She testified that she completed the tenth grade and tried to get her GED in 2009, but was unsuccessful.  R. 35.  She testified that she attempted to work briefly at several charitable and social service agencies, such as agencies identified as the Salvation Army and St. Vincent's.  She testified that they let her go from St. Vincent's because of her social ability.  She testified that she asked too many questions and a co-worker falsely reported that she ate out of the trash.  R. 37.  The Salvation Army let her go after a brief period.  She was told that she was not dependable.  She testified that she missed work one or two days a week.  R. 39.

Adcox worked on the janitorial crew at a facility associated with Transitions and identified as CRC.  R. 49.  She testified that she was on the night crew, but was switched to days because a supervisor made a comment about her social skills and probably about her cleaning ability. She testified that she found that working days was much harder work, and she stopped showing up for work.  R. 49-50.  She testified that she was suffering from ankle pain, hip pain, and pain in her abdomen.  R. 50.

Adcox testified that she also worked for a telemarketing firm for a few months.  She was let go because she missed too much work and she did not do the job "like I was supposed to."  R. 52.  She testified that she could not conduct the parts of the telephone solicitation calls referred to as "rebuttals."  R. 53.

Adcox testified that she had problems working around other people.  Being around co-workers made her nervous.  She worried about how she looked and about what she should say to people.  R. 39.  She also felt that people were talking about her.  R. 42.  She felt worse around men.  She testified that she felt sexually inadequate.  R. 40-41.  She also testified that she felt paranoid.  When she had these feelings, she would go to the other part of the workplace to get away.  R. 41.

Adcox also testified that she was afraid of vehicles.  She testified that she was sometimes afraid to ride in a car.  R. 42.

Adcox testified that she suffered from panic attacks.  She testified that she felt a "[t]ightness in her chest and it gets hard to breathe and I feel like I'm going to die."  R. 43.  She testified that the attack could last "for three hours to days."  R. 43.  She testified that an attack generally lasted all day.  She testified that she had the attacks more often when she went to bed at night.  R. 43.

Adcox testified that she had these panic attacks, "five to seven days a week; mainly during the night when I go to lay down to go to sleep."  R. 44-45.  She testified that she had the attacks once or twice a week during the daytime.  She testified, "It will last all day or it will skip into day after day."  R. 45.  The ALJ continued this line of inquiry:

> ALJ:  So it will last all day or go into two days?  Is that was you are saying?

> A:     Yes.  Two to Six.

> ALJ: Two to six days?  Is that it?

> A:     Yes, Your Honor.

R. 45.  Adcox testified that the worst part of a panic attack lasted about one to three hours.  R. 46.

The ALJ again asked Adcox about the frequency of her panic attacks during the day.  Adcox seem to have some difficulty with the questioning at this point.  The ALJ called a recess to allow Adcox to talk to her attorney in private.  R. 47.  After the recess, Adcox testified that she had three panic attacks per week during daytime hours and five per week during the nighttime.  She testified that the panic attacks last one to three hours.  R. 48.  The ALJ asked Adcox if she was having difficulty answering the questions.  Adcox responded, "I just feel pressure."  R. 48.  Adcox testified

that she felt nervous and that it was difficult to pay attention, "but I will try my hardest to."  R. 49.

Adcox testified that she also suffered from depression.  She testified that her depression made her feel like she did not want to do anything.  The depression also made her feel worthless.  She testified that she did not enjoy things.  She would rather stay tucked away from people.  She had crying spells.  She also felt like hurting herself or others.   R. 53.

The ALJ asked Adcox about her medication for her mental conditions. Adcox testified that she had been taking medications since December 2010.  She testified that she started medications before, but stopped.  She testified that she was in denial and thought she could control everything without the medication.  She also testified that she was scared of the side effects of the medication.  R. 54.

Adcox testified that she felt calmer on her current medication.  She testified that she did not have fits.  She did not feel like hurting herself or others as much as she used to.  She testified, "I have wanted to punch people in the face though and hurt myself only one time."  R. 55.  She testified that she had these feelings four weeks before the hearing.  At that time, she cut herself.  R. 55.

Adcox testified that the medication reduced her anxiety attacks.  She
testified that her prior testimony about anxiety attacks described the attacks
before she went on her current medication in December 2010.  Since she
started her medication, she has had six attacks per month at night, and
eight to twelve attacks per month during the day.  The attacks were also
shorter.  She testified that the worst part of an attack lasted a half-hour to
an hour, and the total attack usually lasted about six hours.  In response to
additional questioning, she testified that the worst part lasted a little more
than an hour.  Adcox testified that the duration of the worst part of an attack
was cut in half by the medication.  Adcox also testified that the attacks no
longer lasted for days.  R. 57-58.   Adcox testified that the medication also
reduced her symptoms of depression.  R. 59.

The vocational expert Kutschbach then testified.  The ALJ asked
Kutschbach to assume a person of Adcox's age with her education and
work experience who could lift "at least 25 pounds and could do simple
routine tasks and do simple routine work at a competitive rate; one or two
step assemblies with limited contact with supervisors and coworkers."
R. 60.  Kutschbach testified that such a person could not do Adcox's past
work as a telemarketer.  Kutschbach testified that such a person could
work as a kitchen helper and floor waxer.  Kutschbach testified that 1,300

kitchen helper positions existed in the Chicago metropolitan area and in Missouri, and 500,000 such jobs existed nationally.  Kutschbach testified that 100 to 250 floor waxer positions existed in the region and 115,000 nationally.  R. 61-62.

The ALJ asked Kutschbach to assume the person had ten to twelve panic attacks per month that lasted half an hour to an hour.  The person needed to sit down or lie down during these attacks.  Kutschbach testified that no jobs would be available for such a person in the national economy.  R. 63.  The hearing then concluded.

## THE DECISION OF THE ALJ

The ALJ issued her decision on June 24, 2011.  R. 10-22.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet, or be medically

equivalent to, one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant's impairments, combination of impairments, do not meet or

equal a Listing, then the ALJ proceeds to Step 4.

     If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to her prior work considering her age,

education, work experience, and Residual Functional Capacity (RFC).

20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to her

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering her RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  Briscoe ex

rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater,

55 F.3d 309, 313 (7th Cir. 1995).

     The ALJ found that Adcox met her burden at Steps 1 and 2.  Adcox

was not engaged in substantial gainful activity, and Adcox suffered from

severe impairments due to bipolar disorder, PTSD, borderline personality

disorder traits, and paranoid personality features.  R. 12.  At Step 3, the
ALJ found that Adcox's impairments did not meet or equal any Listing.
R. 12-14.

At Step 4, the ALJ found that, "[T]he claimant has the residual
functional capacity to perform medium work . . . except the claimant is
limited to simple, routine work.  There should be limited contact with
supervisors and co-workers and minimal demands for social interaction."
R. 14.  The ALJ relied on the opinions of Drs. Froman and Mehr.  R. 18-19.
The ALJ also relied on Adcox's function reports in which she reported that
she did household chores, cooking, cared for her daughter, took care of her
own personal hygiene, and could use public transportation.  R. 19.  The
ALJ also found that her uncle's report of her activities supported the RFC
finding.  R. 19.

The ALJ found that Adcox's testimony regarding the severity of her
symptoms was not credible.  R. 15.  The ALJ noted that Adcox's testimony
was inconsistent regarding her panic attacks.  The ALJ noted that she
testified at one point that the attacks lasted two to six hours, but at another
point testified that the attacks lasted for days.  She testified that these
attacks happened five to seven times at night per week and one to two
times in the day per week.  The ALJ stated that she changed her testimony

after talking to her attorney; after talking to him, she testified that she had five panic attacks per week at night and three panic attacks per week during the daytime.  R. 15.   The ALJ also found Adcox's testimony to be inconsistent about the effects of the medication she started in December 2010.  Adcox testified that the medication helped, but then testified that she intentionally cut herself while on the medication.  R. 15.

After determining Adcox's RFC, the ALJ determined that Adcox met her burden at Step 4.  She could not perform her past relevant work.  R. 21.

The ALJ determined at Step 5 that the Commissioner met her burden to prove that Adcox could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Kutschbach that Adcox could work as a kitchen helper and floor waxer.  R. 22.  The ALJ found that Adcox was not disabled.

Adcox appealed to the Commissioner's Appeals Council.  On September 21, 2012, the Appeals Counsel denied her request for review. The ALJ's decision then became the decision of the Commissioner.  R. 1. Adcox then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ's is supported by substantial evidence. Dr. Mehr opined that Adcox could perform work under the conditions that were consistent with the ALJ's RFC.  Dr. Froman opined that Adcox could work under the conditions set forth in the ALJ's RFC if Adcox had an

effective treatment regimen.  Adcox testified that she had been on her medications since December 2010 and the medication had been effective. Dr. Sanchez-Zuniga's notes from December 14, 2010, indicate that Adcox reported no anxiety or panic attacks.  All of this information provides substantial evidence to support the ALJ's finding of Adcox's RFC.  The opinion of vocational expert Kutschbach supports the ALJ's finding that the Commissioner met her burden at Step 5 to show that Adcox could perform a substantial number of jobs in the national economy.  Thus, the ALJ's decision that Adcox was not disabled was supported by substantial evidence.

Adcox argues that the ALJ did not consider the impact of her impairments on her RFC.  The Court disagrees.  The ALJ limited Adcox's RFC to simple, routine work with limited contact with supervisors and co-workers and minimal demands for social interaction.  This limitation is consistent with the limitations set forth in the opinions of Drs. Mehr and Froman.  These psychologists considered Adcox's mental limitations in coming to these opinions.  The ALJ thus considered Adcox's mental impairments when she followed these opinions.[2]

---

[2] Adcox also cites persuasive authority that a history of a GAF score below 50 is evidence of disability. Adcox Motion, at 8 n. 2 (citing Pates-Fires v. Astrue, 564 F.3d 965 (8th Cir. 2009). The Seventh Circuit has not adopted this position.  See e.g., Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).  This Court must follow the Seventh Circuit.

Adcox argues that the ALJ improperly blamed her for failing to comply with treatment.  The ALJ commented on Adcox's history of non-compliance.  The RFC finding, however, was not based on a failure to comply with treatment.  Rather, the RFC was based on the opinions of Drs. Mehr and Froman and Adcox's reports of her daily activities.  <u>See</u> R. 19.

Adcox argues that the ALJ erred in not considering Adcox's panic attacks in formulating the RFC.  The Court again disagrees.  Adcox testified that the medication she had been taking since December 2010 reduced her problem with panic attacks.  Dr. Froman opined that Adcox could work if she stayed on her treatment.  This evidence supports the ALJ's decision not to include panic attacks in the RFC.

The ALJ also found Adcox's testimony about the severity of her symptoms to not be credible, including her testimony about panic attacks.  R. 15.  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d at 413-14.  Adcox argues that the ALJ only supported her credibility finding with vague boiler plate language.  The Court disagrees.  The ALJ noted specific inconsistencies in Adcox's testimony about the panic attacks.  R. 15.  The ALJ noted other specific

inconsistencies in her testimony.  <u>See</u> R. 15.[3]  The ALJ also noted

inconsistent statements in the treatment notes in the record.  R. 20.  The

Court notes that Dr. Froman opined that Adcox overstated her symptoms

and her "subjective assessment of herself is only marginally related to

objective circumstance."  R. 519.  This evidence supports the credibility

finding.  The Court will not revisit that finding.  Based on the credibility

finding, the ALJ's decision not to include panic attacks as a factor in the

RFC is supported by substantial evidence.

WHEREFORE Defendant Acting Commissioner of Social Security's

Motion for Summary Affirmance (d/e15) is ALLOWED, and Plaintiff Birty

Adcox's Brief in Support of Motion for Summary Judgment (d/e 12) is

DENIED.  The decision of the Commissioner is AFFIRMED.  THIS CASE

IS CLOSED.

ENTER:   October 17, 2013

*s/ Byron G. Cudmore*

UNITED STATES MAGISTRATE JUDGE

---

[3] Adcox argues that the inconsistencies in Adcox's testimony constitute evidence of Adcox's illness.  Adcox cites no authority to support this proposition.  Absent some authority, the Court will not assign error for failing to consider inconsistent testimony as evidence of mental illness.  Even if inconsistent testimony was evidence of mental illness, the inconsistencies would also indicate that the testimony was not credible.